NUMBER 13-10-00100-CV

 

                                 COURT OF
APPEALS

 

                     THIRTEENTH DISTRICT OF
TEXAS

 

                         CORPUS CHRISTI -
EDINBURG


____________________________________________________________

 

IN THE INTEREST OF E.S.
AND A.G., CHILDREN

____________________________________________________________

 

                     On appeal from the County
Court at Law No. 5 

                                       of Nueces
County, Texas.

____________________________________________________________

 

                               MEMORANDUM
OPINION 

 

     Before Chief Justice Valdez
and Justices Yañez and Rodriguez

Memorandum Opinion by
Justice Yañez

 

            Appellant,
V.S., appeals the termination of her parental rights to her two children, E.S.
and A.G.[1] 
By three issues, V.S. contends that:  (1) the evidence is legally and factually
insufficient to support the trial court's finding that she violated two
statutory grounds for termination; and (2) the evidence is legally insufficient
to support a finding that termination was in the best interest of the
children.  We affirm.[2]

I.          Background

            V.S.
took E.S., a thirteen-month-old child, to the emergency room with second-degree
burns to her head and face on January 1, 2009.  That day, V.S. also gave birth
to A.G.  On January 13, 2009, the trial court entered an emergency order naming
the Texas Department of Family and Protective Services (the “Department”)
temporary sole managing conservator of the children.  E.S. and A.G. were
removed and placed in foster care.

            On
February 12, 2009, pursuant to section 263.106 of the family code, the trial
court ordered V.S. to comply with each requirement as set out in the
Department’s service plan.[3] 
Under the provisions of the plan, V.S was required to complete the following tasks: 
(1) attend anger management class; (2) attend all of her visitations with her
children; (3) attend parenting class; (4) obtain stable and safe housing; (5)
not to participate in any criminal activity; (6) obtain an individual
psychological evaluation; (7) obtain employment;[4]
and (8) demonstrate that she was capable of providing a safe and stable home
environment for the children.

            On
January 20, 2010, Jessica Rombs, Nancy Sanders Harper, M.D., Porfirio
Gutierrez, V.S., the children’s foster father,[5]
and Rosalinda Torres testified at a bench trial.  After hearing the evidence,
the trial court found by clear and convincing evidence that V.S. had violated
sections 161.001(1)(N) and (O) of the family code and that termination of the
parent-child relationship was in the children’s best interest.[6] 
The trial court ordered the termination of V.S.’s parental rights to E.S. and
A.G.  This appeal ensued.

 II.        Standard
of Review

            Before terminating the parent-child
relationship, the trial court must find that the parent committed an act
prohibited by section 161.001(1) of the Texas Family Code and that termination
is in the child's best interest.[7] 
Involuntary termination of parental rights involves fundamental constitutional
rights and divests the parent and child of all legal rights, privileges,
duties, and powers normally existing between them, except for the child's right
to inherit from the parent.[8] 
Therefore, termination of the parent-child relationship must be supported by
clear and convincing evidence.[9] 
This intermediate standard falls between the preponderance of the evidence
standard of civil proceedings and the reasonable doubt standard of criminal
proceedings.[10] 
It is defined as the "measure or degree of proof that will produce in the
mind of the trier of fact a firm belief or conviction as to the truth of the
allegations sought to be established."[11]

            In reviewing the legal
sufficiency of the evidence supporting parental termination, we must "’look
at all the evidence in the light most favorable to the finding to determine
whether a reasonable trier of fact could have formed a firm belief or
conviction that its finding was true.’"[12] 
We must assume that the trier of fact, the trial court in this case, resolved
disputed facts in favor of its finding if it was reasonable to do so.[13] 
“A corollary to this requirement is that a court should disregard all evidence
that a reasonable fact[-]finder could have disbelieved or found to have been
incredible.”[14] 
However, “[d]isregarding undisputed facts that do not support the finding could
skew the analysis of whether there is clear and convincing evidence.”[15]

            In a factual sufficiency
review, "[w]e must determine whether, on the entire record, a fact-finder
could reasonably form a firm conviction or belief that the parent violated a
provision of section 161.001(1) and that the termination of the parent's
parental rights would be in the best interest of the child."[16] 
Under this standard, we consider whether the

disputed evidence is such that a reasonable fact[-]finder
could not have resolved the disputed evidence in favor of its finding.  If, in
light of the entire record, the disputed evidence that a reasonable fact[-]finder
could not have credited in favor of the finding is so significant that a fact[-]finder
could not reasonably have formed a firm belief or conviction, then the evidence
is factually insufficient.[[17]]

 

III.        The
Evidence

            Rombs, a social worker
with Driscoll Children’s Hospital, testified that due to E.S.’s severe burns,
she completed a psychological assessment of V.S. on January 1, 2009.[18] 
The purpose of the psychological assessment was to rule out or to determine if
there were any “concerns” of abuse or neglect.  V.S. told Rombs that E.S. was
in her care when she was injured and that A.U.G. wished to remain anonymous.[19]

            According to Rombs, V.S.
claimed that E.S. was standing in the bathtub when E.S. turned on the hot water
and burned herself.  Rombs was concerned that V.S.’s explanation of what
happened was inconsistent with E.S.’s injuries because all of the injuries were
to the “upper extremities;” and based on V.S.’s story, “there should have been
burns to the feet, splashes to the leg or splashes to the bottom part of her
torso, which there were not any injuries of that sort.”  Rombs was also
concerned that V.S. did not have the ability to keep E.S. safe because E.S.
“lacked” medical care.  According to Rombs, V.S. told her that the incident
happened between 2:00 and 3:00 a.m. on December 31, 2008—twenty hours before
V.S. brought E.S. to the emergency room.  V.S. informed Rombs that she did not
seek immediate medical attention because she did not notice any redness or
injury to E.S.[20]

            Although Rombs did not
examine E.S., she did review photographs of E.S.’s injuries.  Rombs stated that
E.S. had severe burns to her face and scalp, E.S.’s hair was matted to her
scalp, and her eyes were swollen shut.  Rombs testified that she believed a
reasonable person would have known that E.S. was in severe need of medical
attention.  After conducting her assessment, and because of her concerns that
V.S.’s story was inconsistent with E.S.’s injuries, Rombs contacted the
Department and the Corpus Christi Police Department.[21]

            On cross-examination,
Rombs stated that she conferred with Dr. Harper, Sandra Prado, the “State nurse,”
Dr. O’Daniel, and Julie, the emergency room nurse.[22] 
Rombs believed that the consensus opinion was that E.S. had been submerged in
hot water.  Rombs testified that in addition to the burns, E.S. had a bite mark
on her “bottom.”

            Dr. Harper is a child
abuse pediatrician and the director of the “CARE Team” at Driscoll Children’s
Hospital; her duties include managing the CARE Team and providing consultations
to patients when there are concerns of neglect, failure to thrive, and physical
abuse such as fractures, burns, brain injuries, sexual abuse, sexual assault,
and medical child abuse.  Dr. Harper explained that consultations are detailed
and involve reviewing the patient’s history, physical examination, medical
history, medical records, tests that have been performed, and the child’s
developmental abilities; speaking with physicians that have cared for the child;
and compiling a comprehensive evaluation.

            Dr. Harper stated that
she was asked to consult on E.S.’s case.  Dr. Harper testified that E.S. had
extensive second-degree burns that covered eighteen percent of her body,
including her entire face, the back of her head, and the back of her neck onto
her shoulder.  E.S. also had some “minimal first-degree appearing burn” going
down her back.  E.S. also had an adult human bite mark on her “butt.” 
According to Dr. Harper, E.S. was immediately transferred to the burn unit in
San Antonio because when a child suffers burns of over ten percent of his or
her body, the general rule is the child is transferred to a burn unit.

            Dr. Harper testified that
she was concerned about a few things after she reviewed the hospital records. 
Dr. Harper stated that she was concerned that E.S. sustained the injury
twenty-one to twenty-two hours before V.S. brought E.S. to the hospital.  Dr.
Harper was also concerned that E.S’s heart rate was 208 when she arrived at the
hospital.  Dr. Harper explained that a heart rate of 208 is abnormal and that
such a heart rate indicates that the child needs a quick assessment and is
potentially dehydrated, or going into shock.  Dr. Harper was also concerned
because: 

. . . when you looked at the exam on her body she had
very significant second-degree burns that covered, you know, her entire face,
sparing the chin, the lower lip, sparing just probably a little bit of the
bottom of her earlobes.  It extended all the way through her scalp, the back of
her head.  It was very clearly demarcated, meaning she had very clear marks
where the second-degree burn ended, along her jaw, and along the back of the
hairline.

 

            .
. . .

 

She also had, of course, some areas of second-degree burn
on the back of her neck if I can remember.  The first-degree area, though, was
interesting it was on her back but was kind of diffused.  It wasn’t what we
expected with water flowing across a body.  So, when water flows across the
body that’s hot enough to burn, it makes these sort of flow pyramids and flow
triangles, and that was not present.

 

So just even looking at her injuries I was very concerned
this was not sort of an accidental injury as had been reported to the ER staff.

 

            The trial court then admitted photographs taken at
the hospital on January 1, 2009, at the hospital of E.S.’s injuries.  Dr.
Harper described the injuries as follows:

First, of course, it’s important to point out that she
was just given morphine in case people are wondering, so she’s sleeping after
she had been given some pain medication.

 

Her eyes, however, were swollen shut to the degree
that the doctors actually couldn’t open them and examine them in the emergency
room.  And they actually had some difficulties when the ophthalmologist
examined them in San Antonio.

 

If you look at her face here you can see what I was
referencing earlier.  These are second-degree burns.  And the way that you can
tell the difference is a first-degree burn appears like a sunburn so the skin
appears pink.

 

When you start developing a second-degree burn you get
blistering and you get the sloughing or peeling off of that superficial layer
of skin.  So a second-degree burn burns the skin and starts going down into the
sort of the fatty layer.  Depending on how deep it is, it damages things like
sweat glands and hair follicles along the way.

 

            . . . .

 

This is a second-degree burn.  It spares her lower
lip, meaning, it’s not involving her lower lip and her chin but it covers the
rest of her face, her eyelids, eyebrows, forehead, up into her hairline.  You
can see her right ear here.  It extends across her right ear, sparing her
earlobe at the bottom and sparing her neck.

 

            Dr.
Harper stated that E.S. did not have any burns on her arms, chest, legs, and
fingers, which concerned her because “in general when children accidently turn
on hot water and burn themselves accidentally, generally, there are things such
as splash marks or areas involving arms and legs from either the water coming
out of the faucet or their hands turning faucets on. . . .”  Dr. Harper also
observed that E.S.’s injuries showed that she attempted to protect herself by
bringing her left ear down to her shoulder.

            Dr.
Harper stated that a hot tub is usually set to 104 to 108 degrees and infant
bathtubs are usually set to 99-100 degrees.  According to Dr. Harper, a person
senses pain from heat at around 108-112 degrees; therefore, if a water heater
is set at 120 degrees, a child would be feeling the pain and would be crying
and screaming.  Dr. Harper opined that for a child to sustain the type of burns
E.S. suffered, it would have taken ten minutes of continuous exposure to water
heated to 120 degrees.  However, “[a]s the temperature goes up, the burn
severity increases, so you can more likely get a worse burn and the time that
it takes for it to occur shortens.”  Dr. Harper stated that in water heated to
130 degrees, it would take only a minute for someone to sustain second-degree
burns at 140 degrees, it would take approximately half a minute or seconds to
get a second degree burn, and in 150-degree water, a third-degree burn would be
almost instantaneous.  Dr. Harper testified that she would not expect burns
such as those suffered by E.S. to have been caused by water heated to 120
degrees because V.S. stated she heard E.S. scream and she had enough time to
then rescue E.S. from the hot water.[23] 
In that case, Dr. Harper would have expected first-degree burns.

            When
asked what conclusions she drew from the fact that the burns to E.S.’s back
were not as severe as those to her head, Dr. Harper replied:

Generally, we look
for—when children have an accidental, you know, burns, from water we look for
flow patterns, you know, going across the body.  And you might expect to see
flow down the back or flow on the chest.

 

But then you would
usually see where if it [sic] hot enough to leave such a clear line on the back
of her neck, that second-degree burn should continue down her back if it was
flowing from the water flowing across her head.  So it ended at the back of her
neck and then there was no flow triangle.

 

So generally when we
look at burns, we look at the pattern and generally we have an accidental flow
burn across the back, kind of gives you sort of a very sort of discrete
outline.  It’s symmetric, it’s—the depth of it is the same and it shows you
where the burn kind of just sort of flowed down the back.

 

In this case . . .
it’s just more diffused.  My concern was, was there clothing, was there a
towel, did hot water drip down into a towel where there would have been some
protection from the heat and give you more of a diffused pattern on the back.

 

            Dr.
Harper stated that E.S. suffered from pain and the development of dehydration
and shock, which were life-threatening and could have been easily reversed. 
According to Dr. Harper, medication such as Children’s Tylenol probably would
not have effectively treated E.S.’s pain.

            According
to Dr. Harper, V.S. reported that while E.S. was in her care, she left E.S. in
an empty bath tub to get a towel; she then heard E.S. scream, came back into
the room, and found E.S. standing up while the water was running.  Dr. Harper
stated that the explanation given by V.S. did not explain the injuries
sustained by E.S.  Dr. Harper opined that if E.S. had been sitting down or
standing up in water that was hot enough to cause the types of burns she
sustained, there would have been splash marks on the hands, feet, and other
areas of the body.  Therefore, because there were no splash marks on E.S. or
burns to her feet and hands, “the pattern didn’t fit her getting a flow burn
that she caused herself.”  Dr. Harper stated that she would not expect injuries
to be limited to the face, neck, and back if E.S. had turned the faucet on
herself.

            When
asked if she had an opinion on the manner in which a child would receive burns
such as those sustained by E.S., Dr. Harper responded:

My biggest concern
looking at the pattern and how there was the sparing just on her chin and how
her ear was tucked against her shoulder, this is what we see in those rare
cases when a child is actually immersed head first into scalding water.  With
her arms being spared, perhaps there was a towel wrapped around her upper body
that had prevented an arm or hand from having contact, but it looks as though
her head and her face were just dipped into scalding water.

 

On cross-examination, Dr. Harper stated:

 

My concern is that
the head was immersed.  Whether it was immersed with the running water, with
the assistance of a caregiver, adult, or immersed into standing—whether, sink,
bucket, I don’t know.  But this was what we see when somebody’s had their head
immersed, not from just turning on the water and accidently getting underneath
it.

 

When
asked, “Would it be like somebody grabbing the child and physically putting the
child’s head into water,” Dr. Harper replied, “That is my concern, yes, sir.”

            E.S.
also had superficial burns across her corneas and underneath her eyelids,
meaning that her eyes were either open or not completely sealed shut when she
was in the scalding water.  Dr. Harper concluded that E.S.’s injuries were
non-accidental.  On cross-examination, Dr. Harper stated that in the medical
records from San Antonio, it was documented that E.S.’s injuries were
“‘suspicious of NAT,’ which stands for non accidental trauma.”  Dr. Harper
stated that she was extremely concerned that “whoever caused these injuries [to
E.S.] is a real risk to her.”  On cross-examination, Dr. Harper testified that
the type of injuries E.S. suffered were “graphic and disturbing” and were not
the type “that a parent would have said, oh, this is okay, I can just watch
it.”

             
Gutierrez, a special investigator with the Department, testified that he was
assigned to the case because of “the seriousness of the injuries that were
inflicted on [E.S.].”  According to Gutierrez, the Department removed E.S. and
A.G. because there were inconsistencies in V.S’s and A.U.G.’s stories to the
Department regarding how E.S. was injured.  Gutierrez stated that the
Department determined that E.S. and A.U.G. were lying and that the parents were
not capable of protecting the children because the injuries were so severe. 
Gutierrez testified that A.U.G. had initially said that the child had been
injured while in V.S.’s care; however, once the police department became
involved, “the stories changed” and it was determined that E.S. was with A.U.G.
when she was injured.  A.U.G. stated that he left E.S. in the bath tub to get a
towel and that E.S. turned on the hot water and that she scalded herself.  On
cross-examination, Gutierrez clarified that V.S. also claimed that E.S. was in
her care when she was injured but later admitted that E.S. had been in A.U.G.’s
care.

            Gutierrez
was assigned to go to A.U.G.’s home to take pictures of the bathroom for the
investigation.  Those pictures were given to Dr. Harper.  Gutierrez stated that
he did not “feel safe” at A.U.G.’s house because people that Gutierrez
recognized as being gang members arrived at the house.[24] 
According to Gutierrez, A.U.G. had a lengthy criminal history, including convictions
for possession of marihuana, possession or use of an unlawful criminal
instrument, burglary of a vehicle, assault causing bodily injury, evading
arrest, and resisting arrest.[25] 
Gutierrez stated that A.U.G. had been indicted by a grand jury for the offense
of injury to a child.[26]

            On
cross-examination, Gutierrez read his summary of A.U.G.’s version of how E.S.
was injured.  Gutierrez stated:

[A.U.G.] said that on
December 31 he took [E.S.] a bath around 3:00 or 4:00 in the morning but—and
this is in quotes, did not really know, end quote, the time.  He said that
after the bath he left [E.S.] in the tub but said that there was no water in
the tub and said that he turned the water off.

 

[A.U.G.] said that he
went to a closet to get [E.S.] a shirt to dry her off because there were no
towels.  He said that he heard [E.S.] scream and went to the tub to find [E.S.]
standing in the tub crying.

 

[A.U.G.] said that
the hot water was running and he—and this is in quotes, he knew that she got
burned, end quote.  He said he got her out of the tub and said she was
shaking—and that’s in quotes, when he dried her off but said that she was not
crying anymore.

 

[A.U.G.] said that he
turned off the hot water and did not get burned but he, quote, saw the steam,
end quote coming from the faucet . . . .

 

            . . . .

 

[A.U.G.] said he saw that [E.S.] was red—and
that’s in quotes . . . .

 

            According
to Gutierrez, A.U.G. stated that he then gave E.S. some Children’s Tylenol, and
the redness went away; E.S. felt better because she was “running around.”  A.U.G.
stated that he put E.S. to sleep, and when he woke up at around 4:00 p.m., he
noticed that E.S.’s face was swollen.  At approximately 11:00 p.m., A.U.G. and
his grandmother picked up V.S. and took E.S. to the emergency room.  After A.U.G.
allegedly told V.S. that he “had warrants,” V.S. told A.U.G. that she would say
that E.S. was with her when she was burned.  Gutierrez stated that A.U.G. said
that he left the hospital at approximately 4:00 a.m. and went home and got high
because he was upset.  A.U.G. claimed that E.S. was burned accidently and that
he did not cause the injury.  When shown pictures of E.S.’s injuries, A.U.G. said
that she did not have any blisters the previous night.  However, A.U.G. did
admit that E.S.’s injuries “got bad” because he waited to get her medical
attention.  A.U.G. stated that he had not noticed the bruise on E.S.’s bottom
and that it was probably caused by a young child who visits his home.

            V.S.
testified that she is E.S.’s and A.G.’s biological mother.  V.S. stated that she
did not feel safe at A.U.G.’s house, unless A.U.G. was present.  However, V.S.
admitted that on December 20, 2009, she moved out of A.U.G.’s house and left
E.S. to live alone with A.U.G. until the day she was burned.  V.S. explained
that A.U.G. was her “only babysitter.”  V.S. acknowledged that A.U.G. was
“still on drugs” when she left E.S. in his care.  On cross-examination, V.S.
stated that when A.U.G. called her about E.S.’s injuries, she had not seen E.S.
since Christmas Day—approximately ten days earlier.

            V.S.
stated that A.U.G. told her that he left E.S. in the bath tub with the water
off, then he heard E.S. scream.  When A.U.G. returned, the hot water was on and
E.S. had been burned.  V.S. testified that after seeing the pictures and
hearing A.U.G.’s story several times, she no longer believed A.U.G.’s story
about how E.S. was burned.  V.S. claimed that A.U.G. told her that he waited to
take E.S. to the hospital because “he was scared and . . . he didn’t know what
to do.”  On cross-examination, V.S. testified that she was in labor with A.G.
when A.U.G. called her about E.S.’s injuries.

            According
to V.S., on January 2, 2009, prior to the children’s removal and placement in
foster care, she agreed to place E.S. and A.G. with her aunt and her uncle.  The
children’s aunt and uncle cared for the children for approximately two weeks. 
V.S. admitted that during those two weeks, she did not visit A.G., who was a
newborn, or E.S., who was severely injured.  V.S. stated that she did not have
transportation to make the visitation with her children and that she did not
understand the bus schedules.  V.S. stated that the children’s aunt and uncle
volunteered to give her a ride, but claimed that they refused to go to A.U.G.’s
house, where V.S. was living, because “CPS said that [A.U.G.] wasn’t
allowed—that [the children’s aunt and uncle] weren’t allowed over there.”

            V.S.
admitted that she lied when she told Rombs that when E.S. was injured, E.S. was
in her care.  When asked why she had lied, V.S. replied:

Because I didn’t think CPS was going to get involved and
I thought it was just take her to the hospital and see what they could do for
her, if they could make her better, you know give her medicine to make it go
away, and that was it.  I didn’t think CPS was going to come in, the cops, all
of this.  I didn’t think it was going to happen.

 

The
Department then asked V.S. why CPS’s involvement made a difference; V.S. said,
“I don’t know, ma’am.”  V.S. insisted that she did tell hospital staff what had
happened to E.S., but that she had simply changed one detail—who was caring for
E.S. when she was injured.  The Department asked why she did not say that the
incident occurred at A.U.G.’s house; V.S. replied, “I don’t know, ma’am.”

            V.S.
admitted that when she was interviewed by CPS on January 2, 2009, she continued
to claim that E.S. was in her care when she was injured.  V.S. stated that she
did not know why she continued to lie to CPS but claimed that she was not
“covering up” for A.U.G. or protecting him.  V.S. agreed that she was willing
to take responsibility for what happened to E.S. rather than to “implicate”
A.U.G.  V.S. agreed that she told a detective that she lied about who was
caring for E.S. because she “felt bad” and she wanted to “take the blame.” 
V.S. testified that on January 5, 2009, she told the detective that E.S. was in
“Ms. Jonas Garcia[’s]” care when she was burned.

            After
giving birth to A.G., V.S. moved back into A.U.G.’s house, and according to
V.S., A.U.G. physically abused her.  On one occasion, A.U.G. hit V.S. with his
fist on the side of her face, causing V.S. to sustain a black, swollen eye. 
V.S. claimed that she moved in with A.U.G. because there was nowhere else for
her to go.  V.S. acknowledged that at the time of the trial, she was four
months pregnant with A.U.G.’s child—their third child together.

            V.S.
testified that she pleaded “guilty” to “hindering apprehension” of A.U.G. on
November 30, 2009, and confirmed that she was on probation for that offense at
the time of trial.  On cross-examination, V.S. explained that on August 12,
2009, the police attempted to arrest A.U.G. for injuring E.S., and although
V.S. knew that A.U.G. was in the house, she told the police that she did not
know A.U.G.’s whereabouts and that she had not seen him.  The police found A.U.G.
“hiding inside the couch.”  V.S. admitted that she was protecting A.U.G. from
being arrested that day.

            According
to V.S., A.U.G. began beating her again, and she wanted to remove herself from that
situation.  Therefore, V.S. testified that two months prior to the trial, after
she was released from jail, she moved out of A.U.G.’s house and into A.U.G.’s
mother’s house.  V.S. stated, “And from his mom’s I went to go visit [A.U.G.’s]
Aunt Ruby and I ended up staying the night there.  [A.U.G.] went there . . . 
early Monday morning to go pick me up whether I wanted to leave or not, and
beat me and kept me there for like a week, you know. . . .”  V.S. left A.U.G.’s
house again on approximately November 17, 2009.[27] 
V.S. stated that she had not contacted or spoken with A.U.G. since that day.

            V.S.
acknowledged that the Department’s caseworker had clearly explained to her the
service plan and the steps she needed to take in order to get the children back
and that she had been present for all of the court hearings except on one
occasion.  V.S. stated that she had heard the trial court and her caseworkers
discuss the requirements of the service plan and what she needed to accomplish
before regaining custody of the children.  V.S. testified that after a year,
she had not completed the parenting and anger management classes.  V.S.
claimed, however, that she had almost completed the classes.[28] 
V.S. stated that she had not completed the psychological examination but
claimed she was unable to get an appointment with the doctor because her
paperwork was never forwarded to him.  V.S. did not recall when she attempted
to set up an appointment with the doctor but believed that she had contacted
his office approximately one month before the trial.

            V.S.
acknowledged that she had missed approximately half of her visits with E.S. and
A.G. during the past year.[29] 
V.S. admitted that she did not visit the children at all during the months of
June 2009 through August 2009.  V.S.’s visitation was cancelled in July because
she was not attending, and the visitation had to be reinstated in August.  V.S.
stated that she was not consistent with her visitation.  V.S. explained that
she missed her visits because she had overslept.[30] 
V.S. stated that she understood that her children had waited for her and that
she had failed to attend those visits.  On cross-examination, V.S. testified
that since November 2009, she had attended the visitations with her children.[31]

            V.S.
acknowledged that she did not have a job and that she had not been seeking
employment until she left A.U.G.’s house in November 2009—two months prior to
the trial.  V.S. admitted that she had known for twelve months that she was
required to get a job so that the children would be returned to her.  On
cross-examination, V.S. stated that A.U.G. did not have a job and that to her
knowledge, the only job that he had was when he was sixteen years old.[32]

            V.S.
claimed that she is on a waiting list for housing and that she would be getting
an apartment in approximately twelve to eighteen months.  On cross-examination,
V.S. stated that if the children were returned to her, she planned on going
back to school.[33] 
When asked what her plans were if the children were returned, V.S. said:

Doing anything I can.  I’d get a job to support them. 
Again, with my apartment that I’d get, I’d get anything, you know to keep them
safe.  You know the little plastic things that go in the plugs, those gates
that you put in the stairs so, you know, they don’t climb up or down or so they
don’t hurt themselves, tub stoppers.  I’d do anything and everything to better
myself for them.  I’d go back to school, settle on what I want to do with my
life as career-wise. . . .

 

V.S.
stated that she would request supervised visits if A.U.G. wanted to see the
children.

            V.S.
stated that during the past year, she had resided with A.U.G. and denied
telling her caseworker that she was living with her mother.  V.S. claimed that
she told her caseworker, Torres, that she was living with a friend, Connie
Gallardo.  The Department then asked, “But you never told [Torres] that you
were residing in your mother’s home,” and V.S. replied, “Staying with my mom,
but not in my mom’s home.  My mom doesn’t have a home of her own.”  The following
exchange then occurred:

[The Department]:    So [your mother] also lives with
this Connie?

[V.S.]:                          No,
she doesn’t, not anymore.

 

[The Department]:    Where
were you living, [V.S.], when you were in the same home with your mother. 
Whose home was that?

 

[V.S.]:                          That
was when I was living in the same home as my mother I lived there a few times. 
The first time when I left him, when all of this happened with [E.S.], was in
my mom’s own home.

 

[The Department]:    But
you just said your mom doesn’t have a home?

 

[V.S.]:                          That
was before she got kicked out.  She—recently she got arrested for some stuff
that had happened and then she gotten [sic] kicked out and now she doesn’t have
her own home.  The second time that I had left [A.U.G.] I had I moved in to—I
had learned that my mom didn’t have her place and moved in with her across the
street from that home, which was [Gallardo’s] home.  And that only lasted for
about two weeks.

 

On cross-examination, V.S. stated
that she was not sure who paid the rent for the house where she was living and
believed that either Gallardo or Gallardo’s son, Luis, who received disability
checks, paid the rent.

            Torres, a caseworker with
the Department, testified that in June 2009, she was assigned to this case. 
Torres verified that the Department had been the temporary managing conservator
of E.S. and A.G. for more than nine months.  Torres stated that the trial court
had ordered V.S. and A.U.G. to complete the tasks set out in the family service
plan to regain custody of the children.  Torres said that the service plan had
been explained to V.S. on “numerous occasions” and that V.S. indicated that she
understood the service plan.[34] 
Torres read a portion of the “Family Service Plan Evaluation,” which stated
that as of May 30, 2009,

[V.S.] and [A.U.G.] ha[d] not demonstrated any progress
in caregiver capability.  They continue[d] to miss half of their visitation,
have not started any services or been in any contact with the Department. . .
.  [V.S. and A.U.G.] have not complied with any services for their children. 
They have shown no attempt to improve the quality of care that they can provide
for [E.S. and A.G.].

 

            Torres stated that V.S.
had not complied with the trial court’s order to complete the tasks in the
family service plan, including the parenting classes, the anger management
classes, and the psychological evaluation.[35] 
On cross-examination, Torres explained that the Department’s goal is for the
parent to complete the services in twelve months, and that V.S. has had twelve
months to complete the service plan.  Torres stated that V.S. was incorrect
when she testified that the psychological evaluation had not been performed
because the doctor had not received the paperwork.  Torres explained that the
doctor had written a letter documenting that two appointments had been made,
but that V.S. had missed both appointments.[36]

            When asked if the
Department made reasonable efforts to assist V.S., Torres replied, “We have—we
have arranged services; we have assisted in transportation; we have transported
the children; and we have time and time again, especially with [V.S.] explained
the services; gone over the service plan; talked to the service providers.” 
Torres stated that because V.S. had missed so many visits with the children, the
visits were moved to the Department’s office so that the Department could
transport the children to and from the visits.[37] 
According to Torres, V.S. attended thirty out of sixty-four scheduled visits
with the children.  On cross-examination, Torres stated that because V.S. had
missed so many visits, V.S. was required to call and confirm the visits; if
V.S. failed to call to confirm the visit, it was cancelled.

            Torres testified that
V.S. had not demonstrated an ability to provide a safe environment for the
children because she has not had a stable home, gained employment, or been able
to provide for them financially.  Torres believed that V.S. had not
demonstrated that she is able to protect the children from A.U.G. because V.S.
attempted to protect A.U.G. by lying that E.S. had been in her care when she
was injured, “tried to cover up for him when they were about to arrest him,”
and when V.S. would reunite with A.U.G., she would stop her visitation and
services.[38]

            Torres testified that it
would be in the children’s best interest to terminate V.S.’s parental rights. 
Torres explained:

[E.S. and A.G.] are
still very young.  If the children were maybe eight, ten, 12, you know, maybe
even five, they’d be verbal.  They’re not verbal at this point so that, yet,
they would be vulnerable to not be able to verbalize if there was any harm
being done to them or if they were in any fear.  [V.S.] has back and forth or
gone time and time again, gone back to [A.U.G.] and has then neglected or
avoided to do any services or to visit with the children at the time.

 

So if there’s no
guarantee that she wouldn’t go back to him and now she’s expecting a third
child, so yeah—yes, I do believe it would be in the children’s best interest
that we terminate their rights.

 

            Torres
testified that V.S. had not informed her that she was living with a friend, but
that she was “made aware” of V.S.’s address when she gave her a ride on the
previous day.  Torres stated that V.S. told her that she was living with her
mother.  On re-direct examination, Torres testified that she was not familiar
with the people that apparently resided with V.S. and that the Department would
not place the children in a home without conducting a home study and criminal
background check.

            On
cross-examination, Torres testified that even if the injuries to E.S. were
ruled accidental, she would still recommend termination of V.S.’s parental
rights.  Torres stated:

Well, I still feel
that she is not able to be protective.  She’s still even if, you know, it was
accidental and she’s still tried to—she changed the story and tried to protect
him.  She did hide him.  And she still on occasion continued to go back with
him even after the violence and it wasn’t just the black eye, she had bruises
all over her arms and so I still feel she wouldn’t be protective.

 

Torres
also stated that the Department was concerned that if A.U.G.’s parental rights
were terminated without terminating V.S.’s rights, she would return to him and
continue to allow the children to see A.U.G.  Torres believed that based on
V.S.’s past history with A.U.G., V.S. would return to him.

            According
to Torres, the Department’s goal for the children is permanency and for the
children to be adopted.  Torres stated that when the visits with V.S. are over,
the children do not cry.  On cross-examination, when asked if in her personal
experience, most children the same ages as E.S. and A.G. become very upset when
the parent leaves the visitation, Torres responded, “Yes.  I’m not going to say
all the time, but a lot of the time they do cry and reach out for their mom and
dad or their parents.”

IV.       Discussion

            By
her first and second issues, V.S. contends that the evidence is legally and
factually insufficient to support the two grounds for termination.[39] 
By her third issue, V.S. contends that the evidence is legally insufficient to
support the trial court’s finding that termination of her parental rights was
in the best interest of the children.

A.        Section
161.001(1)(O)

            In
this case, the trial court found that V.S. had 

failed to comply with the provisions of a court order
that specifically established the actions necessary for the parent to obtain
the return of the child[ren] who [have] been in the permanent or temporary
managing conservatorship of the Department of Family and Protective Services
for not less than nine months as a result of the child[ren’s] removal from the
parent under Chapter 262 for the abuse or neglect of the child[ren].[[40]]

 

V.S.
only challenges that she failed to comply with the provisions of the court’s
order requiring her to comply with the family service plan.  V.S. alleges that
“although she initially was not completely compliant with her service plan, for
the months leading up to trial she was more than compliant and well on her way
to completing them.”[41] 
However, at trial, it was undisputed that V.S. had not complied with the trial
court’s order that she complete the tasks listed in the family service plan.

            The
Department developed a family service plan for V.S. to follow in order to
regain custody of her children, and the trial court ordered V.S. to comply with
that plan.  Under the provisions of the plan, V.S. was required to obtain an
individual psychological evaluation, which V.S. admitted she had not completed.[42] 
V.S was required to complete anger management and parenting classes, which she
admitted that she had failed to complete.  The family service plan required
V.S. to attend all of her visitation with her children.  However, V.S. stated
that she had missed many of her visits with her children, and Torres testified
that V.S. had only attended 30 out of 64 scheduled visits with the children. 
V.S. was ordered to obtain stable and safe housing.  However, at trial, V.S.
was unable to adequately describe her living arrangements and indicated that
she had moved from residence to residence because she did not have any place to
go.  Furthermore, the plan required that V.S. not participate in any criminal
activity.  However, V.S. pleaded guilty to the criminal offense of hindering
apprehension after choosing to protect A.U.G. from being arrested for allegedly
injuring E.S.  Under the terms of the family service plan, either A.U.G., V.S.,
or both were required to obtain employment.  V.S. testified that neither she
nor A.U.G. had a job.

            Finally,
V.S. was required to demonstrate that she was capable of providing a safe and
stable home environment for the children.  Rombs testified that she did not
believe that V.S. had the ability to keep E.S. safe because of the lack of
medical care provided to E.S.  According to Torres, V.S. had not demonstrated
an ability to provide a safe environment for the children because she had not
provided a stable home, gained employment, or been able to provide for the
children financially.  Furthermore, V.S. has repeatedly returned to A.U.G. even
though he has abused her and has been indicted for abusing E.S., and V.S.
testified that she would request that A.U.G. be granted visitation, although
supervised, with the children.

            After
viewing all of the evidence in the light most favorable to the finding, we
conclude that there was legally sufficient evidence for a reasonable trier of
fact to form a firm belief or conviction that V.S. failed to comply with the
provisions of a court order that specifically established the actions necessary
for the parent to obtain the return of the children.[43] 
Furthermore, after examining the entire record, we conclude that the evidence
was factually sufficient to support the trial court's finding that J.C.
violated section 161.001(1)(O) of the family code.[44] 
We overrule V.S.’s second issue.[45]

B.        Best
Interest

            By
her third issue, V.S. generally asserts that there is “no evidence to support
the [trial court’s] finding that termination of the parent-child relationship”
is in the children’s best interest.  V.S. argues that she “tried to comply
[with the service plan],” she “was attending parenting and anger management
classes,” and she has a good relationship with her children.

            When
considering whether parental termination is in the child's best interest, the
following non-exhaustive list of factors should be considered:  (1) the desires
of the child; (2) the emotional and physical needs of the child now and in the
future; (3) the emotional and physical danger to the child now and in the
future; (4) the parenting abilities of the parties seeking custody; (5) the
programs available to assist the parties seeking custody; (6) the plans for the
child by the parties seeking custody; (7) the stability of the home or proposed
placement; (8) the acts or omissions committed by the parent which may indicate
that the existing parent-child relationship is not proper; and (9) any excuse
for the acts or omissions committed by the parent.[46] 
The party seeking parental termination is not required to prove all nine
factors.[47] 
Furthermore, when the Department or another government agency is the petitioner,
subsection 263.307(a) of the family code provides that "the prompt and
permanent placement of the child in a safe environment is presumed to be in the
child's best interest."[48] 
Subsection (b) then lists thirteen factors the court, the department, or other
authorized agencies should consider in determining whether a parent is
"willing and able to provide the child with a safe environment."[49] 
In our review of the trial court's termination order, we will likewise 

give
consideration to these factors to the extent applicable.[50]

            Although
there is a strong presumption that it is in the child’s best interest to allow
the natural parent to retain custody, when confronted with evidence to the
contrary, that presumption disappears.[51] 
Evidence proving one or more of the statutory grounds for termination may be
probative in determining that termination is in the best interest of the child.[52] 
A best-interest analysis may be based on direct evidence, circumstantial
evidence, subjective factors, and the totality of the evidence as a whole.[53] 
“A parent's unstable lifestyle, lack of income, and lack of a home may also be
considered in a determination of a parent's ability to provide for a child's
emotional and physical needs and may also threaten the physical well being of
the child.”[54]

            Here,
A.G. was too young to express her desire about the matter, and E.S. had limited
communication abilities due to a speech impediment.  However, the children’s
foster father testified that although E.S. had the ability to communicate
verbally “to get her thoughts across,” she had never asked to see V.S. and had
never indicated that she missed V.S.  He also stated that although he and his
wife encouraged their foster children to address them by their first names;
E.S. called his wife “Mommy.”  Finally, Torres testified that although most
children cry when a visitation with a parent ends, neither E.S. nor A.G. cried
when visitation with V.S. ended.

            V.S.
started living with A.U.G. when E.S. was six or seven months old.  When E.S.
was thirteen months old, V.S. moved out of A.U.G.’s home because V.S. claimed
that abused her.  V.S. admitted that when she left A.U.G.’s home, she left E.S.
with A.U.G., even though she was afraid to be at A.U.G.’s home alone and she
knew that A.U.G. was “still on drugs.”  V.S. stayed with her mother; however,
V.S. did not explain why she could not take E.S. with her.  V.S. acknowledged
that before she left E.S. alone with A.U.G., he had not provided any care for
E.S.  V.S. did not see E.S. while E.S. lived with A.U.G. until the night that
E.S. was injured—approximately two weeks later.

            Dr.
Harper was concerned about how E.S. had been injured and opined that the burns
were consistent with a person immersing E.S.’s head into water.  Dr. Harper
stated that the burn going all the way from the face up into the entire scalp
and hairline meant that E.S.’s “head would have to [have been] fully immersed
in hot water. . . .  It looks as though her head and face were just dipped into
scalding hot water.”  Dr. Harper agreed that based on reasonable medical
certainty, E.S.’s injuries were non-accidental.   Therefore, the explanation
V.S. and A.U.G. gave the hospital and the Department is not consistent with the
injuries sustained by E.S.

            After
E.S. and A.G. were removed, V.S. moved back to A.U.G.’s home despite the fact
that he had abused her and it was suspected that he had caused the injuries to
E.S.  According to V.S., A.U.G. continued abusing her when she returned to his
home, including an incident when A.U.G. punched V.S. in the face for no
apparent reason.  V.S. admitted that while living with A.U.G., she committed
the crime of hindering apprehension by lying to the police to protect A.U.G. from
being arrested for allegedly causing the injury to E.S.  V.S. lived with A.U.G.
“during the pendency of this case” until November 2009.  At the time of the
trial, V.S. was four months pregnant with her third child with A.U.G.

            Torres
testified that V.S. has not demonstrated an ability to provide a safe
environment for E.S. and A.G. because V.S. has not acquired her own stable
home, she has not been able to provide for them financially, and she does not
have a job.  According to Torres, V.S. is not able to protect the children from
A.U.G. because of her history of lying to protect him and because when she
lived with him, she would stop her visitations with the children and her
services with the Department.  Torres stated:

[V.S.] would be doing her services, attending visitation,
and then she would stop.  And when we would come back I would meet with her to
reinstate, it would be that she had gotten back with him.

 

            . . . .

 

When she’s away from [A.U.G.] she is cooperative with the
Department and with me.  She does participate, but it’s when she goes back and
that’s what my concern [sic], that she continues to go back [to A.U.G.]

 

            . . . .

 

Based on her history, based on her lying in the
beginning, her hiding him, and her going back to him a number of times, I think
that even if the Department were to, you know, reunify with her and terminated
on the dad, there would be some chance of her still allowing—or going back to
him. . . .  The Department is concerned about the well-being of the children
and that’s why we’re asking for termination.

 

Torres
said that that based on V.S.’s past history of leaving A.U.G. and then
returning to him repeatedly, she believed V.S. would return to A.U.G. in the
future “because it seems to be a pattern.”[55]

            According
to Torres, termination of V.S.’s parental rights is in the best interest of the
children.  Dr. Harper testified that she has concerns about E.S. returning to
the home where she received the injuries because being burned so severely is “a
fairly lethal way to injure a child because a lot of these kids don’t survive
the shock [and] whoever caused these injuries is a real risk to her.”  Although
V.S. stated, “I know I can protect [the children],” she admitted that she had
done “nothing” to show the trial court that she had that ability.

            Even
after approximately twelve months, V.S. had not completed the requirements of
the family service plan including the parenting classes.  Torres testified that
V.S. had twelve months to complete twelve classes, but she had not done so. 
From the evidence presented, the trial court may have determined that V.S. had
poor parenting skills and had not been motivated to learn how to improve her
skills.  Also, Torres testified, and V.S. admitted, that she had not completed
her psychological evaluation.

            V.S.
testified that if the children were returned to her, she would get a job and
return to school to acquire her GED.  V.S. stated that although she was living
with a friend, she was on a list to acquire housing of her own.  However, V.S.
explained that it could take approximately twelve to eighteen months for her to
actually get an apartment.  V.S. did not state where she intended to live with
the children in the meantime.  The Department planned for the children to be placed
for adoption.  The children were residing with foster parents who had ten years’
experience.  The foster father testified that the children were adoptable and
that he knew of a family that was interested in adopting them.

            The
evidence showed that V.S. had not been employed for the past year that her
children were in the Department’s custody.  For the majority of the previous
year, V.S. lived with A.U.G., who had been arrested for causing E.S.’s
injuries.  And, V.S. stated that while living with A.U.G., he abused her.  V.S.
finally left A.U.G. and moved in with a friend two months before the trial. 
According to V.S., she did not have any other place to go.  V.S. testified that
she has left A.U.G. in the past; however, for unexplained reasons, she has gone
back to him on numerous occasions. Therefore, the trial court may have
concluded that V.S. is unable to provide for the children’s emotional and
physical needs because she has not secured a stable home in which they could
live.

            Examining
all of the evidence in the light most favorable to the trial court’s finding,
we conclude that the trial court could have reasonably formed a firm belief or
conviction that terminating V.S. parental rights was in the best interest of
E.S. and A.G.[56] 
Accordingly, we overrule V.S.’s third issue.

V.        Conclusion

            We
affirm the trial court’s judgment.

                                                                                                Linda
Reyna Yañez

                                                                                                JUSTICE

 

 

Delivered and filed the 

21st day of December, 2010.  









[1]
See Tex. R. App. P.
9.8(b)(2) (providing that in a parental-rights termination case, “the court
must, in its opinion, use an alias to refer to a minor, and if necessary to
protect the minor's identity, to the minor's parent or other family member”).





[2]
The trial court also terminated the children’s father’s parental rights;
however, the father, A.U.G. does not appeal the trial court’s order terminating
his parental rights to E.S. and A.G.





[3]
See Tex. Fam. Code Ann. §
263.106 (Vernon 2008).





[4]
Specifically, the service plan required that either A.U.G., V.S., or both
obtain employment.





[5]
The children’s foster father.





[6]
See Tex. Fam. Code Ann. §
161.001(1)(N), (O) (Vernon Supp. 2010).





[7]
Tex. Fam. Code Ann. § 161.001; id.
§ 153.002 (Vernon 2008); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).





[8]
Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985); see In re D.S.P.,
210 S.W.3d 776, 778 (Tex. App.–Corpus Christi 2006, no pet.).





[9]
In re J.L., 163 S.W.3d at 84; In re D.S.P., 210 S.W.3d at 778.





[10]
In re G.M., 596 S.W.2d 846, 847 (Tex. 1980); In re C.S., 208 S.W.3d
77, 83 (Tex. App.–Fort Worth 2006 pet. denied); Porter v. Tex. Dep't of
Protective & Regulatory Servs., 105 S.W.3d 52, 57 (Tex. App.–Corpus
Christi 2003, no pet.).





[11]
Tex. Fam. Code Ann. § 101.007
(Vernon 2008); see In re C.H., 89 S.W.3d 17, 25 (Tex. 2002).





[12]
In re J.L., 163 S.W.3d at 85 (quoting In re J.F.C., 96 S.W.3d
256, 266 (Tex. 2002)).





[13]
Id.





[14]
Id.





[15]
Id.





[16]
In re M.C.T., 250 S.W.3d 161, 168 (Tex. App.–Fort Worth 2008, no pet.)
(citing In re C.H., 89 S.W.3d at 28).





[17]
In re J.F.C., 96 S.W.3d at 266.





[18]
On cross-examination, Rombs stated that V.S. brought E.S. to the emergency room
after midnight, and she interviewed V.S. at approximately 2:00 a.m.  V.S. then
gave birth to A.G.





[19]
On cross-examination, Rombs stated that V.S. said that she and E.S.’s father
“were no longer together but they still talked.”  Rombs acquired A.U.G.’s
information from the police department.





[20]
We note that V.S. is not a nurse, physician, or trained to treat E.S.’s
injuries.





[21]
On cross-examination, Rombs testified that E.S. was transferred to a burn unit
in San Antonio.





[22]
The record does not contain Julie’s last name or Dr. O’Daniel’s first name.





[23]
This is the same explanation given by A.U.G. after he admitted that E.S. was in
his care when she was injured.





[24]
Before working for the Department, Gutierrez worked in law enforcement.





[25]
A.U.G.’s criminal record was admitted into evidence.  The record shows that
A.U.G. pleaded “guilty” or “nolo contendere” to each offense.





[26]
The trial court admitted a copy of the indictment into evidence.





[27]
The trial was held on January 20, 2010.  Therefore, at the time of the trial,
V.S. had not lived with A.U.G. for approximately two months.





[28]
On cross-examination, V.S. said that she started attending parenting and anger
management classes one month before the trial.  V.S. stated that she attended
six parenting classes and five anger management classes.





[29]
On cross-examination, V.S. stated that she did not send any cards or letters to
the children and that she did not get them any Christmas presents because she
did not have any money.





[30]
On cross-examination, V.S. clarified that the visits were scheduled for 5:00 or
6:00 p.m.  V.S. explained that she took naps during the day and that is why she
overslept.





[31]
V.S. stated that she missed two visits due to illness; however, V.S. admitted
that on one occasion, she did not notify the caseworker that she was going to
miss the visit.





[32]
At the time of the trial, A.U.G.
was twenty-one.





[33]
V.S. testified that she quit school when she was eighteen and in ninth grade.





[34]
On cross-examination, Torres stated, “Initially when I first got the case and I
first met with her, and I thoroughly explained everything to her and explained
how easy it could be to just participate and attend services just to get her
children.  I reminded her that they were her children and I did that on
numerous occasions.  Of course, I wanted to reunify.”





[35]
On cross-examination, Torres clarified that since November 2009, V.S. had
attended six of twelve parenting and anger management classes.





[36]
The dates of those appointments were October 22, 2009 and December 1, 2009.





[37]
Torres stated that the arrangement relieved the foster parents from making unnecessary
trips.





[38]
According to Torres, when V.S. separated from A.U.G., she would start her
services and visitation again.





[39]
See Tex. Fam. Code Ann. §
161.001(1)(N), (O).





[40]
See id. § 161.001(1)(O) (providing that a trial court may terminate a
person’s parental rights under section 161.001(1)(O), if it finds by clear and
convincing evidence that the parent "failed to comply with the provisions
of a court order that specifically established the actions necessary for the
parent to obtain the return of the child who has been in the permanent or
temporary managing conservatorship of the Department of Family and Protective
Services for not less than nine months as a result of the child's removal from
the parent under Chapter 262 for the abuse or neglect of the child").





[41]
We note that V.S. does not challenge the other elements of section
161.001(1)(O) in her brief.





[42]
In her brief, V.S. concedes that she did not complete the psychological
examination.





[43]
See In re J.L., 163 S.W.3d at 85.





[44]
See In re M.C.T., 250 S.W.3d at 168.





[45]
If, as here, the trial court terminated the parent-child relationship on
multiple grounds under section 161.001(1), we may affirm on any one ground
because, in addition to a finding that termination is in the child's best
interest, only one predicate violation under section 161.001(1) is necessary to
support the trial court’s termination order.  See In re A.V., 113 S.W.3d
355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001(1)
is necessary to support a judgment of termination when there is also a finding
that termination is in the child's best interest."); In re E.A.K.,
192 S.W.3d 133, 151 (Tex. App.–Houston [14th Dist.] 2006, pet. denied)
("Because we find that there was legally sufficient evidence to support
one of the predicate findings for termination of [A.U.G.'s] parental rights, we
need not address the sufficiency of the evidence relating to other predicate
findings.").  Therefore, because we have concluded that the evidence is
legally and factually sufficient to support the trial court's finding that V.S.
violated section 161.001(1)(O), we need not consider V.S’s first issue
contending that the trial court’s finding that she violated section
161.001(1)(N) is legally and factually insufficient.  See In re A.V.,
113 S.W.3d at 362; In re E.A.K., 192 S.W.3d at 151; see also Tex. Fam. Code Ann. § 161.001(1)(N),(O).





[46]
Holley v. Adams, 544 S.W.2d 367, 372 (Tex. 1976).





[47]
See In re C.H., 89 S.W.3d at 27 (providing that these considerations are
not exhaustive "or that all such considerations must be proved as a
condition precedent to parental termination") (emphasis in original); In
re J.R.S., 232 S.W.3d 278, 284 (Tex. App.–Fort Worth 2007, no pet.)
("These factors are not exhaustive; some listed factors may be inapplicable
to some cases; other factors not on the list may also be considered when
appropriate.").





[48]
Tex. Fam. Code Ann. § 263.307(a)
(Vernon 2008).





[49]
Id. § 263.307(b).  Those factors enumerated in section 263.307(b)
include, among others, the following:

(1) the child's age and physical and mental
vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the
harm to the child;

            . . . .

(6) the results of psychiatric, psychological, or
developmental evaluations of the child, parents,   other family members, or
others who have access to the child's home;

(7) whether there is a history of abusive or assaultive
conduct by the child's family or others who             have access to the
child's home;

(8) whether there is a history of substance abuse by the
child's family or others who have access             to the child's home;

            . . . .

(10) the willingness and ability of the child's family
to seek out and accept, and complete            counseling services and to
cooperate with and facilitate an appropriate agency's close          supervision;

(11) the willingness and ability of the child's family
to effect positive environmental and personal             changes within a
reasonable period of time. . . .

Id.





[50]
See In re R.R., 209 S.W.3d 112, 116 (Tex. 2006) (per curiam); In re
S.N., 272 S.W.3d 45, 50-51 (Tex. App.–Waco 2008, no pet.); In re T.N.F.,
205 S.W.3d 625, 632-33 n.3 (Tex. App.–Waco 2006, pet. denied).





[51]
In re A.I.G., 135 S.W.3d 687, 692 (Tex. App.–San Antonio 2003, no pet.).





[52]
In re A.A.A., 265 S.W.3d 507, 516 (Tex. App.–Houston [1st Dist.] 2008,
pet. denied).





[53]
In re T.N., 180 S.W.3d 376, 384 (Tex. App.–Amarillo 2005, no pet.)
(citing In re C.A.J., 122 S.W.3d 888, 894 (Tex. App.–Fort Worth 2003, no
pet.)).





[54]
Id.





[55]
See In re M.R.J.M., 280 S.W.3d 494, 502 (Tex. App.–Fort Worth 2009, no
pet.) (op. on reh'g) (explaining that a trier of fact may rely on past conduct
to infer that similar conduct will occur in the future).





[56]
See In re J.L., 163 S.W.3d at 85.